# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# TALLAHASSEE DIVISION

BRUCE KREITMAN,

     Plaintiff,

v.                                            CASE NO.: 4:20-cv-44

THE FLORIDA DEPARTMENT OF
CORRECTIONS, an agency of the State
of Florida,
WEXFORD HEALTH SOURCES,
INC., a Florida corporation,
CORIZON, LLC, an out-of-state
corporation registered and doing
business in Florida, and
CENTURION OF FLORIDA, LLC, a
Florida limited liability company,

     Defendants.

_____/

## COMPLAINT

The Plaintiff, Bruce Kreitman, by and through the undersigned counsel, hereby sues the Florida Department of Corrections ("FDC"), Wexford Health Sources, Inc. ("Wexford"), Corizon, LLC ("Corizon"), and Centurion of Florida, LLC ("Centurion") (collectively, the "Defendants"), and alleges as follows:

## INTRODUCTION

1.    This is a civil rights action for monetary damages. Plaintiff is an inmate incarcerated in Defendant FDC's prison system. Plaintiff is suing Defendants for deliberating depriving him of medically necessary treatment for hepatitis C.

Specifically, Plaintiff sues Defendant FDC for discriminating against him on the basis of disability in violation of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act ("RA") and Defendants Wexford, Corizon, and Centurion for their deliberate indifference to Plaintiff's serious medical needs in violation of the Eighth Amendment to the United States Constitution.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over the claims asserted herein pursuant to 28 U.S.C. § 1331 in that this is a civil action arising under the Constitution of the United States.

3.      Venue is proper in the Northern District of Florida, Tallahassee Division, as Defendant FDC is headquartered with its principle place of business in Tallahassee, Florida and a substantial part of the events or omissions giving rise to Plaintiffs claims occurred in the Northern District of Florida. *See* 28 U.S.C. § 1391.

4.      The claims alleged herein are brought within the applicable statute of limitations.

5.      Plaintiff has complied with all conditions precedent and has fully and properly exhausted all administrative remedies prior to filing this action. Alternatively, Plaintiff alleges that administrative remedies were unavailable to him and therefore need not be exhausted prior to filing suit.

## THE PARTIES

6.     Plaintiff is an inmate incarcerated in Defendant FDC's prison system. He has been incarcerated since June 17, 2013. Throughout his incarceration, Plaintiff has been housed at numerous prisons owned and operated by Defendant FDC, including South Florida Reception Center ("SFRC"), Charlotte Correctional Institution ("Charlotte CI"), Desoto Correctional Institution ("Desoto CI"), Hardee Correctional Institution ("Hardee CI"), Northwest Florida Reception Center ("NWFRC"), Marion Correctional Institution ("Marion CI"), Columbia Correctional Institution ("Columbia CI"), Reception and Medical Center ("RMC"), and Hamilton Correctional Institution ("Hamilton CI"). Plaintiff was denied treatment for his HCV at every correctional facility he was housed.

7.     Defendant FDC is an agency of the State of Florida that owns and operates correctional facilities throughout the State, including every prison where Plaintiff was housed and denied treatment for his HCV throughout his incarceration, and receives federal funds to operate its agency. Defendant FDC is headquartered in Tallahassee, Florida. Defendant FDC is responsible for the medical care of all individuals confined in its prison system. Further, Defendant FDC is responsible for overseeing the operations of its contractors, including Defendants Wexford, Corizon, and Centurion. Defendant FDC discriminated against Plaintiff—a qualified

individual with a disability due to his infection with chronic HCV—by deliberately depriving treatment for his chronic HCV.

8.     Defendant Wexford is a Florida corporation and provider of correctional healthcare services. From December 2012 until June 2017, Defendant Wexford contracted with FDC to provide healthcare services to inmates confined in FDC prisons generally located in South Florida, including SFRC, Charlotte CI, Desoto CI, and Hardee CI, where Plaintiff was housed and denied treatment for his HCV. From December 2012 until approximately June 2017, Defendant Wexford was responsible with FDC for Plaintiff's medical care.

9.     Defendant Corizon is an out-of-state corporation, registered and doing business in Florida. From October 2012 until May 2016, Defendant Corizon contracted with FDC to provide healthcare services to inmates confined in FDC prisons not covered under Defendant Wexford's contract, including NWFRC, Marion CI, and RMC, where Plaintiff was housed and denied treatment for his HCV. From October 2012 until May 2016, Defendant Corizon was responsible with FDC for Plaintiff's medical care.

10.     Defendant Centurion is a Florida limited liability company and provider of correctional healthcare services. In February 2016, Defendant Centurion contracted with FDC to provide healthcare services to inmates confined in FDC prisons, including Marion CI, Columbia CI, RMC, and Hamilton CI, where Plaintiff

was housed and denied treatment for HCV. In May 2016, Defendant Centurion took over as FDC's healthcare vendor for the prisons previously covered under Corizon's contract. Following the termination of Wexford's contract in June 2017, Defendant Centurion became FDC's sole healthcare provider. Since May 2016, Defendant Centurion has been responsible with FDC for Plaintiff's medical care.

## FACTS

### Background Information on Hepatitis C

11.   Hepatitis C is a blood borne disease caused by the hepatitis C virus ("HCV"). The virus causes inflammation that damages liver cells and is a leading cause of liver disease and liver transplants.

12.   HCV can be either acute or chronic. In people with acute HCV, the virus will spontaneously clear itself from the blood stream within six months of exposure. Chronic HCV, on the other hand, is defined as having a detectable HCV viral level in the blood at some point six months after exposure. Fifty (50) to eighty (80) percent of infected people will develop chronic HCV.

13.   Liver inflammation caused by chronic HCV can significantly impair liver function and damage its crucial role in digesting nutrients, filtering toxins from the blood, fighting infection, and conducting other metabolic processes in the body. Liver inflammation can also cause fatigue, weakness, muscle wasting, skin rashes, and arthritis.

14.     People with chronic HCV develop fibrosis of the liver, a process by which healthy liver tissue is replaced with scarring. When scar tissue begins to take over most of the liver, this extensive fibrosis is termed cirrhosis. Scar tissue cannot perform the job of normal liver cells, so fibrosis reduces liver function and results in the same symptoms mentioned above, but with greater intensity. Fibrosis can also lead to liver failure and hepatocellular carcinoma (liver cancer).

15.     The amount of liver scarring a patient has is usually measured on the METAVIR scale. On this scale, a person can be classified F0 (no fibrosis), F1 (mild fibrosis), F2 (moderate fibrosis), F3 (severe fibrosis), or F4 (cirrhosis).

16.     Among those with chronic HCV, the majority will develop progression liver disease and approximately 20% will develop cirrhosis in a 20-year timeframe. Patients with rapid fibrosis liver progression may reach cirrhosis within as short a timeframe as one year.

17.     Cirrhosis causes additional painful complications, including widespread itching, kidney disease, jaundice, fluid retention with edema, internal bleeding, varices (enlarged veins that develop in the esophagus or intestines, which can burst), easy bruising, ascites (fluid accumulation in the legs and abdomen), encephalopathy (mental confusion and disorientation), lymph disorders, increased risk of infection, seizures, and extreme fatigue. Most of these complications can

occur before cirrhosis. If they go untreated, some can cause death, often from infection, bleeding, and fluid accumulation.

18.     Abdominal ascites can require paracentesis, a procedure wherein a needle is inserted into the abdomen to drain the fluid. Without this periodic procedure, the fluid accumulation can decrease the available space for the patient's lungs, thus causing shortness of breath and difficulty breathing.

19.     Moreover, once an HCV patient's liver has cirrhosis, it may not be reversible. Some patients with cirrhosis may have too much scar tissue in the liver, even if the liver can heal to some degree once the virus is eliminated by treatment. If scar tissue persists, the patient may still experience the complications of cirrhosis, including liver cancer.

20.     Chronic HCV is, as a matter of law, a serious medical need. *See Mitchell v. Nobles*, 878 F.3d 869, 876 (11th Cir. 2017).

21.     Plaintiff's disabling condition was chronic HCV. In other words, Plaintiff's "disability" was chronic HCV, as defined under the ADA and RA.

## **General Prevalence of HCV**

22.     Approximately 2.7 to 3.9 million Americans have chronic HCV.

23.     In 2000, the United States Surgeon General called HCV a "silent epidemic," and estimated that as much as two percent of the adult U.S. population had HCV.

24.     In 2013, HCV caused more deaths than sixty other infectious diseases combined, including HIV, pneumococcal disease, and tuberculosis.

25.     Approximately 19,000 people die of HCV-caused liver disease every year in the United States.

26.     HCV is the leading indication for liver transplants in the United States.

### HCV in Prison

27.     The prevalence of HCV in prison is much higher than in the general population. It is estimated that between 16% and 41% of the United States' jail and prison population has HCV. Thus, incarceration is a risk factor for HCV.

28.     Defendant FDC has reported to the media and researchers that 5,000 to 5,272 of its approximately 98,000 inmates have HCV. As of August 8, 2016, Defendant FDC listed 4,797 inmates as having HCV in its internal records. As of late-2017, it was estimated that FDC had knowledge of at least 7,000 inmates who were infected with HCV.

29.     In fact, because it is estimated that between 16% and 41% of incarcerated people have HCV, it is likely that between 14,700 and 40,184 FDC inmates have HCV. The true number is likely at the higher end of that spectrum because of the high prevalence of HCV in Florida: Between 2009 and 2013, rates of acute HCV in Florida increased by 133%.

## Standard of Care for HCV

30.    For many years, there were no universally safe and effective treatments for HCV. The standard treatment prior to 2011, which included the use of interferon and ribavirin medications and sometimes required injections, had a long treatment duration (up to 48 weeks), failed to cure most patients, and was associated with numerous side effects, including psychiatric and autoimmune disorders, flulike symptoms, gastrointestinal distress, skin rashes, and severe anemia. Moreover, not all drug regimens worked for all types of HCV, and many could not be given to patients with other comorbid diseases.

31.    In 2011, however, the Food and Drug Administration ("FDA") began approving new oral medications, called direct-acting antiviral ("DAA") drugs, which have proven to work more quickly, cause fewer side effects, and treat chronic HCV much more effectively. At first, they were designed to work in tandem with the old treatment regimen. But beginning in 2013, the FDA began to approve DAA drugs that can be taken alone.

32.    As of late-2013, DAA drugs became available for HCV patients.

33.    These DAA drugs have far fewer side effects, dramatically greater efficacy, a shorter treatment duration (12 weeks), and are administered orally (commonly a once-daily pill) rather than by injections. They have truly revolutionized the way HCV is treated.

34.     Most importantly, 90 to 95% of HCV patients treated with any of these DAA drugs are cured, whereas the old treatment regime only helped roughly one third of patients.

35.     For HCV, a "cure" is defined as a sustained virologic response (SVR)— *i.e.*, no detectable HCV genetic material in the patient's blood—for three months following the end of treatment.

36.     In response to the revolutionary DAA medications, the American Association for the Study of Liver Diseases ("AASLD") and the Infectious Disease Society of America ("IDSA") formed a panel of experts to conduct an extensive, evidence-based review of the testing, management, and treatment of HCV. The results of that review have been published in a comprehensive document called the HCV Guidance, which is updated regularly and is available at www.hcvguidelines.org.

37.     The HCV Guidance set forth the medical standard of care for the treatment of HCV, which is well-established in the medical community.

38.     In 2014, the AASLD/IDSA panel, through the HCV Guidance, recommended treatment with DAA drugs for all persons with chronic HCV. The recommendation reflected the continuing medical research showing the safety, tolerability, efficacy, and dramatic benefits of the DAA drugs.

39.     Treatment with DAA drugs has been the standard of care for the treatment of HCV since 2014.

40.     Under this standard of care, treatment with DAA drugs is expected to cure nearly all infected persons.

41.     The benefits of immediate treatment include immediate decrease in liver inflammation, reduction in the rate of progression of liver fibrosis, reduction in the likelihood of the manifestations of cirrhosis and associated complications, a 70% reduction in the risk of liver cancer, a 90% reduction in the risk of liver-related mortality, and a dramatic improvement in quality of life.

42.     Treatment must be provided timely to ensure efficacy. Delay in treatment increases the risk that the treatment will be ineffective.

### Public Health Benefits of Treatment in Prison

43.     Providing expanded HCV screening and DAA treatment in Florida's prisons would greatly reduce the number of new HCV cases in the community. Curing the disease while people are in prison would prevent inmates from transmitting it when released, and testing would diagnose numerous individuals who were unaware they were infected, thus allowing them to seek treatment once released.

44.     Studies have shown that providing DAA treatment to everyone with chronic HCV increases long term cost-savings. One study even found that restricting

DAA treatment access until patients were in the later stages of fibrosis actually results in higher per-patient costs because, while it may be initially less expensive to delay administering DAAs, over the course of treatment, the follow-up care outweighs the initial costs.

45.     Thus, early DAA treatment has the potential to both drastically reduce the incidence of HCV in the general population and also to reduce the costs associated with serious complications from untreated HCV, such as liver transplants and liver cancer.

## Defendants Policy and Practice of Not Providing Treatment to Inmates with Chronic HCV

46.     From late-2013, when DAAs first became available, until approximately October 2017, Defendant FDC and its medical contractors, including Defendants Wexford, Corizon, and Centurion, had a policy and practice of not providing DAA drugs to inmates with chronic HCV.

47.     Defendant FDC enforced such policy and practice despite knowing that the failure to provide DAA drugs to inmates with HCV subjects those inmates to an unreasonable risk of pain, liver failure, cancer, permanent damage to their health, and even death. By doing so, Defendant FDC has caused the unnecessary and wanton infliction of pain and an unreasonable risk of serious damage to the health of inmates infected with HCV, including the Plaintiff.

48.     From December 2012 until June 2017, Defendant Wexford utilized the same policy and practice of not providing DAA drugs to inmates with HCV as Defendant FDC. Defendant Wexford enforced such policy and practice despite knowing that the failure to provide DAA drugs to inmates with HCV subjects those inmates to an unreasonable risk of pain, liver failure, cancer, permanent damage to their health, and even death. By doing so, Defendant Wexford has caused the unnecessary and wanton infliction of pain and an unreasonable risk of serious damage to the health of inmates infected with HCV, including the Plaintiff.

49.     From October 2012 until May 2016, Defendant Corizon utilized the same policy and practice of not providing DAA drugs to inmates with HCV as Defendant FDC. Defendant Corizon enforced such policy and practice despite knowing that the failure to provide DAA drugs to inmates with HCV subjects those inmates to an unreasonable risk of pain, liver failure, cancer, permanent damage to their health, and even death. By doing so, Defendant Corizon has caused the unnecessary and wanton infliction of pain and an unreasonable risk of serious damage to the health of inmates infected with HCV, including the Plaintiff.

50.     At all relevant times since May 2016, Defendant Centurion has utilized the same policy and practice of not providing DAA drugs to inmates with HCV as Defendant FDC. Defendant Centurion enforced such policy and practice despite knowing that the failure to provide DAA drugs to inmates with HCV subjects those

inmates to an unreasonable risk of pain, liver failure, cancer, permanent damage to their health, and even death. By doing so, Defendant Centurion has caused the unnecessary and wanton infliction of pain and an unreasonable risk of serious damage to the health of inmates infected with HCV, including the Plaintiff.

51.    From late-2013, when DAA drugs first became available, until approximately November 2017, when Defendant FDC was court-ordered[1] to begin treating HCV-infected inmates, Defendants failed and/or refused to provide DAA drugs to thousands of inmates with HCV—including Plaintiff—in contravention of the prevailing standard of care and in deliberate indifference to the serious medical needs of inmates with chronic HCV in Florida. This policy was implemented because of the cost of the treatment.

52.    As a result of Defendants failure and/or refusal to provide DAA drugs, over 100 inmates died of untreated HCV and hundreds more suffered irreparable liver damage.

53.    Defendants also unjustifiably delayed providing treatment to HCV-infected inmates, even though the standard of care requires treatment as early as possible. Delayed DAA treatment increases the risk that the treatment will be

---

[1] *See Hoffer v. Jones*, 290 F. Supp. 3d 1292 (N.D. Fla. 2017) (granting preliminary injunction); *see also Hoffer v. Inch*, 382 F. Supp. 3d 1288 (N.D. Fla. 2019) (granting permanent injunction).

ineffective. If treatment is delayed until a patient develops decompensated cirrhosis, a liver transplant may provide the only cure.

54.    At all times relevant hereto, Defendants categorically withheld treatment from FDC inmates with HCV but did not categorically withhold treatment from inmates with other similar diseases or conditions (such as HIV) or from other inmates without similar diseases or conditions.

55.    Defendants had a policy under which inmates with chronic HCV were not provided lifesaving medications for their disability, while inmates with other disabilities had access to lifesaving medications.

56.    Defendants refused to provide FDC inmates, including the Plaintiff, with the necessary treatment for their HCV, and the only treatment recommended under the prevailing standard of care, because of the cost of the treatment.

57.    Defendants discriminated against Plaintiff and other HCV-infected inmates on the basis of disability.

**Defendants Deliberately Deprived Plaintiff of**
**Medically Necessary Treatment for His Chronic HCV**

58.    Plaintiff has been incarcerated in the Florida prison system since June 17, 2013. He has a history of HCV since approximately 2005, which was diagnosed by FDC staff during a prior incarceration. At his initial intake health screening in 2013, Plaintiff informed FDC medical staff that he had HCV. Thereafter, a blood draw was performed by FDC medical staff, which confirmed Plaintiff's diagnosis

with HCV. Plaintiff was subsequently referred to the Chronic Illness Clinic for his chronic HCV for "monitoring."

59.    Throughout his incarceration, Plaintiff regularly inquired about the condition of his liver and requested treatment for his HCV. All of Plaintiff's requests were denied. Moreover, Plaintiff was not adequately informed of the severity of his liver disease and the substantial health risks associated with chronic HCV.

60.    From June 2013 until January 2018, Plaintiff was only given routine blood draws to monitor his HCV. During this time period, Plaintiff was not provided treatment for HCV and, in particular, was not provided DAAs even though treatment with DAAs was required under the standard of care since 2014.

61.    DAA medications were available to Defendants upon request. However, Defendants did not request DAA drugs for, or provide DAA drugs to, Plaintiff until January 2018.

62.    Whether an FDC inmate receives DAA treatment almost exclusively relies on the inmate's METAVIR or fibrosis score (F0-F4). Under FDC's guidelines, inmates are then prioritized for treatment based on their fibrosis score, which reflects the stage and progression of their liver disease. Nonetheless, until November 2017, Defendants failed to require or perform the necessary tests to determine the stage and progression of Plaintiff's HCV, and thus, whether Plaintiff met the criteria for treatment under FDC's guidelines.

63.     It was not until November 2017—more than twelve (12) years after FDC diagnosed him with HCV—that Plaintiff was given a FibroSure test to determine his fibrosis score. The results showed a fibrosis score of F4, thus indicating that Plaintiff had cirrhosis. However, Plaintiff's liver was likely cirrhotic prior to November 2017. In fact, Plaintiff's physicians suspected he had developed cirrhosis, as well as variceal bleeding, in as early as 2016. Despite Plaintiff's clinical presentation, no DAA treatment was provided to Plaintiff at that time.

64.     For years Defendants led Plaintiff to believe that he was on the list to be treated. But Defendants had no intention of treating Plaintiff. Instead, Defendants withheld treatment from Plaintiff until January 2018 in order to save costs and increase profits. Treatment was only provided to Plaintiff *after* the Court in *Hoffer* ordered FDC to begin treating HCV-infected inmates with DAA medications.

65.     Throughout his incarceration, Plaintiff repeatedly and specifically requested medical treatment for his HCV, both verbally and through the grievance process. Plaintiff even offered to pay for the medication himself. Defendants refused these requests. In fact, Plaintiff was told that he did not qualify for treatment under FDC's treatment guidelines. Instead, Defendants merely continued to "monitor" Plaintiff's HCV from June 2013 until January 2018, at which time Plaintiff finally received DAA treatment.

66.     Plaintiff repeatedly requested an accommodation for his chronic HCV—that is, treatment which could result in a cure for his disability. This request for DAA treatment was a request for a reasonable accommodation in that DAA drugs are the only recommended form of treatment capable of clearing HCV from Plaintiff's body. Nonetheless, Defendants denied providing Plaintiff with such treatment until January 2018.

67.     Plaintiff's request for DAA drugs as treatment for HCV was a reasonable request for a reasonable accommodation as the Defendants were constitutionally required to provide such medication as treatment for HCV. Administering DAA drugs were necessary under the prevailing standard of care for treating individuals with HCV, and has been since 2014.

68.     Despite Plaintiff's HCV-diagnosis, severe HCV-related symptoms, and repeated requests, Plaintiff was not provided DAA treatment until January 2018.

69.     Plaintiff should have received treatment with DAA drugs as early as 2014 in accordance with the prevailing standard of care.

70.     Plaintiff ultimately developed cirrhosis of the liver, and other serious complications associated with cirrhosis, due to Defendants' refusal and delay in providing treatment for his HCV.

71.     Defendants refused to provide DAA treatment for Plaintiff's HCV because Defendants had a policy and practice of not providing DAA drugs to HCV

inmates. This policy and practice was implemented for non-medical reasons, including, *inter alia*, the cost of the treatment.

72.     In other words, Defendants' refusal to provide DAA treatment for non-medical reasons constituted a deliberate indifference towards Plaintiff and his serious medical need and disability.

73.     By being denied access to DAA treatment for his HCV by the Defendants, Plaintiff was denied meaningful access to prison programs, services, and activities, including access to medical services.

74.     Plaintiff has suffered and continues to suffer from a variety of symptoms directly caused by or associated with HCV including, but not limited to: weight loss, surface bleeding, dry and itchy skin, nausea, confusion, increased muscle weakness, severe abdominal pain, and joint pain, and extreme fatigue. In fact, some days Plaintiff's is unable to muster up enough strength to get out of bed.

75.     Plaintiff has also suffered and continues to suffer from a variety of symptoms or conditions indirectly caused by or associated with HCV including, but not limited to: cirrhosis, splenomegaly, anemia, jaundice, portal hypertension, esophageal varices with bleeding, and ascites.

76.     In short, Plaintiff has suffered serious, substantial, and permanent injuries, including irreparable liver damage, as a result of Defendants' failure to provide him necessary medical care and treatment for his chronic HCV.

77.     The irreparable damage suffered by Plaintiff may have been prevented if not for Defendants' unconstitutional denial and delay of treatment for HCV. Plaintiff continues to suffer damages as a result of Defendants' deliberate indifference to his serious medical need and disability.

**COUNT I**
**TITLE II OF THE AMERICANS WITH DISABILITIES ACT (ADA)**
**(Against Defendant FDC)**

78.     Plaintiff incorporates and re-alleges paragraphs 1 through 77 as if fully set forth herein.

79.     This count is brought under Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. 12101, *et seq.* and 42 U.S.C. §§ 12131–12134, and its implementing regulations.

80.     The ADA prohibits public entities from discriminating against individuals with disabilities in their services, programs, and activities. 42 U.S.C. §§ 12131–12134; *see also* 28 C.F.R. §§ 35.130. In other words, the ADA impose an affirmative duty on public entities to create policies and procedures to prevent discrimination based on disability.

81.     Defendant FDC is a "public entity" within the meaning of 42 U.S.C. § 12131(1) and 28 C.F.R. § 35.104.

82.     Plaintiff had chronic HCV, which is a physiological disorder or condition that affects one or more body systems, including but not limited to the

digestive, gastrointestinal, immune, circulatory, cardiovascular, and hemic systems, and is therefore a physical impairment. 42 U.S.C. § 12102(1) & (2); 28 C.F.R. § 35.108(a) & (b). This physical impairment substantially limits one or more major life activities, including but not limited to eating, walking, bending, lifting, concentrating, thinking, and communicating; the operation of major bodily functions such as digestive, gastrointestinal, immune, circulatory, cardiovascular, and hemic systems; and the operation of the liver. 42 U.S.C. § 12102(2); 28 C.F.R. § 35.108(c).

83.     In other words, Plaintiff's chronic HCV caused him to have a disability as defined under the ADA. Stated differently, Plaintiff's disability was chronic HCV.

84.     Plaintiff has a record of having an impairment that substantially limits one or more major life activity, as he has a history of such an impairment. 42 U.S.C. § 12102(1)(B); 28 C.F.R. § 35.108(a)(1)(ii) & (e).

85.     Plaintiff is regarded by FDC as having an impairment that substantially limits one or more major life activity, as FDC perceives him as having such an impairment. 42 U.S.C. § 12102(1)(C) & (3); 28 C.F.R. § 35.108(a)(1)(iii) & (f). Defendant FDC has subjected Plaintiff to a prohibited action because of an actual or perceived physical impairment.

86.     Plaintiff was a qualified individual with a disability because he met the essential eligibility requirements for the receipt of services or the participation in

programs or activities provided by Defendant FDC, including but not limited to medical services. 42 U.S.C. § 12131(2); 28 C.F.R. § 35.104.

87.     By withholding medical treatment from those with HCV, but not withholding medical treatment from those with other disabilities or those who are not disabled, Defendant FDC excluded Plaintiff from participation in, and denied him the benefits of, FDC services, programs, and activities (such as medical services) by reason of his disability. 42 U.S.C. § 12132; 28 C.F.R. § 35.130(a).

88.     By withholding medical treatment from those with HCV, but not withholding medical treatment from those with other disabilities or those who are not disabled, Defendant FDC subjected Plaintiff to discrimination. 42 U.S.C. § 12132; 28 C.F.R. § 35.130(a).

89.     DAAs are the only effective medical treatment available for HCV under the prevailing standard of care, and is the constitutionally-required treatment under the Eighth Amendment. Plaintiff requested DAA treatment for his HCV, which was a request for a reasonable accommodation for his HCV. By denying or delaying in providing DAA treatment to Plaintiff, Defendant FDC refused or failed to provide Plaintiff a reasonable accommodation for his request for treatment of his HCV in violation of Title II of the ADA.

90.     Defendant FDC failed to provide Plaintiff with equal access to and enjoyment of effective medical services. 28 C.F.R. § 35.130(b)(1).

91.     Defendant FDC utilized criteria or methods of administration that had the effect of subjecting Plaintiff to discrimination and that defeated or substantially impaired accomplishment of the objectives of medical treatment for HCV. 28 C.F.R. § 35.130(b)(3).

92.     DAAs were readily available to Defendant FDC during this time period and yet it categorically refused to provide Plaintiff with treatment that the medical community deems essential.

93.     Defendant FDC denied and delayed providing Plaintiff with the necessary treatment and reasonable accommodation for his HCV because of the cost of the treatment and accommodation.

94.     Defendant FDC knew about the violations described herein but failed to correct them, thereby exhibiting deliberate indifference to the rights of Plaintiff. Such violations include but are not limited to:

(a)     FDC's decision to adopt and enforce a policy of not providing treatment to HCV-infected inmates;

(b)     FDC's refusal to provide Plaintiff with necessary medical treatment for his HCV, and the only treatment available under the prevailing standard care;

(c)     FDC's refusal to provide Plaintiff with DAA drugs because of the high, unbudgeted cost of the treatment; and

(d)    To the extent it lacked sufficient funds to purchase and treat HCV-infected inmates like Plaintiff with DAAs, FDC's refusal or failure to even request adequate funding from the Florida Legislature.

95.    Had Defendant FDC not delayed but instead provided Plaintiff with DAA treatment and the reasonable accommodation he requested throughout his incarceration, Plaintiff would not have suffered additional injuries, including both physical injuries and emotional pain and suffering.

96.    Defendant FDC owed Plaintiff a non-delegable duty to ensure that his wellbeing would not be compromised as a result of discrimination based on his disability. As such, Defendant FDC is vicariously liable for the actions of any and all persons or entities Defendant FDC contracted out its medical services to or otherwise designated to care for Plaintiff.

97.    As a direct and proximate cause of Defendant FDC's actions and omissions, Plaintiff has suffered and continues to suffer from harm and violation of his ADA rights.

WHEREFORE, Plaintiff demands judgment against Defendant FDC for compensatory damages, including for physical injury, disfigurement, permanent physical injury, and emotional pain and suffering, for all prejudgment interest allowable under law, for attorney's fees and costs incurred in connection with this litigation, and for such other relief as this court deems appropriate.

## COUNT II
## SECTION 504 OF THE REHABILITATION ACT (RA)
### (Against Defendant FDC)

98.    Plaintiff incorporates and re-alleges paragraphs 1 through 77 as if fully set forth herein.

99.    This count is brought under Section 504 of the Rehabilitation Act (RA), 29 U.S.C. § 701, *et seq.* and 29 U.S.C. § 791–794, *et seq.*, and its implementing regulations.

100.   Section 504 of the RA prohibits discrimination against persons with disabilities by any program or activity receiving Federal financial assistance. 29 U.S.C. § 794(a).

101.   Defendant FDC is a program or activity receiving federal financial assistance within the meaning of 29 U.S.C. § 794.

102.   Defendant FDC excluded Plaintiff—a qualified individual with a disability—from participation in, and denied him the benefits of, programs or activities solely by reason of his disability (chronic HCV). 29 U.S.C. § 794(a); 29 U.S.C. § 705(20); 28 C.F.R. § 42.503(a).

103.   Defendant FDC subjected Plaintiff—a qualified individual with a disability—to discrimination. 29 U.S.C. § 794(a).

104.   Defendant FDC denied Plaintiff—a qualified handicapped person—the opportunity accorded to others to participate in programs and activities. 28 C.F.R. § 42.503(b)(1).

105.   Defendant FDC utilized criteria or methods of administration that either purposely or in effect discriminate on the basis of handicap, and defeat or substantially impair accomplishment of the objectives of FDC's programs or activities with respect to handicapped persons. 28 C.F.R. § 42.503(b)(3).

106.   Defendant FDC knew about the violations described herein but failed to correct them, thereby exhibiting deliberate indifference to the rights of Plaintiff.

107.   As a direct and proximate cause of Defendant FDC's exclusion and discrimination, Plaintiff has suffered and continues to suffer from harm and violation of his RA rights.

WHEREFORE, Plaintiff demands judgment against Defendant FDC for compensatory damages, including for physical injury, disfigurement, permanent physical injury, and emotional pain and suffering, for all prejudgment interest allowable under law, for attorney's fees and costs incurred in connection with this litigation, and for such other relief as this court deems appropriate.

## COUNT III
## 42 U.S.C. § 1983 – EIGHTH AMENDMENT *MONELL* CLAIM
### (Against Defendants Wexford, Corizon, and Centurion)

108.   Plaintiff incorporates and re-alleges Paragraphs 1 through 77 as if fully set forth herein.

109.   This count is brought through 42 U.S.C. § 1983 and against Defendants Wexford, Corizon, and Centurion for violation of the Eighth Amendment's prohibition of cruel and unusual punishment on inmates.

110.   At all times relevant hereto, Defendants Wexford, Corizon, and Centurion and their policymakers knew about and enforced policies, practices, and/or custom that exhibited deliberated indifference to Plaintiff's serious medical needs in violation of the Eighth Amendment. Defendants Wexford, Corizon, and Centurion, acting through their employees and agents, intentionally delayed, failed, and refused to provide Plaintiff with treatment that will address his serious medical needs despite knowing that its actions would result in Plaintiff's continued suffering and exposure to liver failure and its symptoms, liver cancer, and death.

111.   Defendants Wexford, Corizon, and Centurion have caused the wanton infliction of pain upon Plaintiff, an HCV-infected inmate, by exhibiting deliberate indifference to his serious medical needs and condition.

112.   The refusal to provide treatment by Defendants Wexford, Corizon, and Centurion, acting through their employees and agents, worsened Plaintiff's serious

medical condition. Left untreated, Plaintiff's medical needs posed a substantial risk of serious harm, and in fact, did cause actual harm. Defendants Wexford, Corizon, and Centurion knew of this substantial risk of serious harm, and the actual harm, faced by Plaintiff, and yet disregarded those risks and harms by failing to provide Plaintiff with the medication that would have alleviated those risks and harms. Thus, Defendants Wexford, Corizon, and Centurion have been deliberately indifferent to the substantial risk of serious harm posed to Plaintiff in connection with his chronic HCV.

113.   By denying Plaintiff medically-necessary treatment for his HCV, or unjustifiably delaying in providing such treatment, Defendants Wexford, Corizon, and Centurion imposed punishment far in excess of that authorized by law, contrary to the Eighth Amendment.

114.   Defendants Wexford, Corizon, and Centurion's denial and delay of the medically necessary treatment for Plaintiff's HCV violated all standards of decency, contrary to the Eighth Amendment.

115.   Defendants Wexford, Corizon, and Centurion's actions with respect to Plaintiff amounted to grossly inadequate care; medical care that can only charitably be described as cursory such that it amounted to no medical care at all.

116.   Defendants Wexford, Corizon, and Centurion refused to provide treatment for Plaintiff's HCV because they had a policy and practice of not providing

DAA drugs to HCV patients, which was implemented for non-medical reasons, including the cost of the treatment.

117.   The constitutional violations of Defendants Wexford, Corizon, and Centurion, through the actions and omissions of their employees and agents, were directly and proximately caused by policies, practices, and/or customs implemented and enforced by Defendants Wexford, Corizon, and Centurion.

118.   As a direct and proximate result of the policies, practices, customs, and deliberate indifference of Defendants Wexford, Corizon, and Centurion, Plaintiff has suffered substantial damages, including permanent physical injuries and emotional pain and suffering.

WHEREFORE, Plaintiff demands judgment against Defendants Wexford, Corizon, and Centurion for compensatory damages, punitive damages, attorney's fees and costs, and such other relief as this court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial for all counts alleged above.

*[Signatures on following page]*

Respectfully submitted,

**ANDREWS LAW FIRM**
822 North Monroe Street
Tallahassee, Florida 32303
T: (850) 681-6416 / F: 681-6984

*/s/ John M. Vernaglia*
STEVEN R. ANDREWS (FBN 0263680)
RYAN J. ANDREWS (FBN 0104703)
JOHN M. VERNAGLIA (FBN 1010637)
steve@andrewslaw.com
ryan@andrewslaw.com
john@andrewslaw.com
service@andrewslaw.com
*Counsel for Plaintiff*